NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JOSE LUIS VARELAS, | ) | No. C 08-03505 JF (PR) |
| Petitioner, | ) | ORDER DENYING PETITION FOR |
| vs. | ) | WRIT OF HABEAS CORPUS |
| DARREL ADAMS, Warden, | ) | |
| Respondent. | ) | |

Petitioner, proceeding pro se, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  In an order to show cause issued on October 24, 2008, this Court found that Petitioner had raised three cognizable claims for federal habeas relief and ordered Respondent to show cause why the writ should not be granted.  Respondent filed an answer addressing the merits of the petition, and Petitioner filed a traverse.  Having reviewed the papers and the underlying record, the Court concludes that Petitioner is not entitled to federal habeas corpus relief and will deny the petition.

**FACTUAL AND PROCEDURAL BACKGROUND**

The following facts and procedural background are taken from the unpublished opinion of the California Court of Appeal:

Order Denying Petition for Writ of Habeas Corpus
P:\PRO-SE\SJ.JF\HC.08\Varelas505_denyHC.wpd

I.      **Prosecution Case**

Vanessa Ruiz met defendant in 2002. She became pregnant with defendant's child two or three months later; their son was born in September 2003.

A.      **October 28, 2003 Incident**

On October 28, 2003, Vanessa and her son were living with her parents in Morgan Hill. That morning, Vanessa appeared in court and obtained a restraining order against defendant. Defendant was present at the hearing and was served with a copy of the order. That evening, Vanessa's aunt, Claudia Ruiz,[] was in a local tattoo shop. Defendant walked in, screamed "Where's Vanessa?" then asked "Is she getting fucked?"

1.      **Testimony of Felipe Ruiz and Officer Berlin**

Defendant appeared at Vanessa's home later that evening. Felipe Ruiz, Vanessa's father, testified that defendant was sweaty, breathing hard, and almost crying. He was arguing with Vanessa. Felipe did not want Vanessa to be with defendant, so he gave defendant a ride home.

Morgan Hill Police Officer Curtis Berlin and other officers went to defendant's residence in Morgan Hill around 10:00 p.m. on October 28, 2003, in response to a complaint by a neighbor of a woman yelling for help. The officers searched outside for signs of a struggle and searched the house, but did not find anything.

Later that night, Vanessa called home and told her father she was spending the night at defendant's house. Her father responded "I don't think so" and went to defendant's house to pick her up. Vanessa got into the car right after her father arrived and said "Take me straight to the cops." Felipe testified that Vanessa looked like she had been dragged around. She had bruises on her hand and shoulder and appeared to be afraid. She had a lump on her right hand that was swollen for days. She said defendant struck her hand with a hammer. She told her father someone had called the police and defendant would not let her go outside to get help when the police arrived.

Felipe drove Vanessa to the police station, where she was interviewed by Officer Berlin. According to Officer Berlin, Vanessa appeared upset. She had red, bloodshot, very puffy eyes and looked like she had been through a severe ordeal. After conducting an initial interview, Officer Berlin asked Vanessa to repeat her story on videotape. (RT 385) The prosecution played the videotaped interview for the jury.

2.      **Taped Interview of Vanessa**

Vanessa told Officer Berlin she was surprised to see defendant when he showed up at her house that day because "she had put him in jail" two weeks before. Defendant was sweating and crying and said they needed to get back together. He asked her to stop seeing Phil, a man she was dating.

After defendant and her father left, Vanessa walked to her aunt's house. As she walked home, defendant drove by with his cousin, asked her where she was coming from, and told her to get into the car. Defendant grabbed her by the hair and threw her into the backseat of the car. He pulled her hair and asked whether she had just slept with another man. He pulled her hair so hard, she was screaming. Vanessa told the officer defendant had pulled her hair and slapped her before.

When they arrived at defendant's house, he pulled her out of the car by her hair. She fell onto the dirt driveway. Defendant kicked her arms and legs and hit her. He grabbed her head and slammed it into the dirt. Defendant's brother, Lupe Varelas (Lupe), heard her screaming, came outside, and pushed defendant off Vanessa. Defendant hit Lupe and kicked Vanessa again. Defendant put his hands on her throat so she could not breathe. He let go and she screamed. Defendant covered her nose and mouth and told her not to scream.

They went inside Lupe's room. Defendant said, "I'm going to kill this bitch tonight." While inside, he slapped her in the face twice and pulled her hair. He grabbed a hammer and threatened to kill her. Defendant asked her whether she had had sex with Phil. When she told defendant she had not done anything, he told her to call Phil and tell him she was in love with defendant. He threatened to kill her if she did not call; he threatened to stick her with a utility knife. When the police arrived, defendant told her to say she was okay so they would go away. But she was a mess, so they hid in the garage. He threatened to hit her with the hammer if she said anything. Defendant told her to call her father and say she was staying with him that night. She called, but her father did not believe her and picked her up.

Vanessa told the officer her right hand was swollen because defendant had kicked it. She said he had swung the hammer at her and hit her right forearm. She estimated defendant had slapped and punched her 10 to 14 times and kicked her five times.

### 3.   Further Testimony by Officers Berlin, Swing and Newmeyer

Officer Berlin testified that there were minor inconsistencies between Vanessa's original statement and her videotaped statement with regard to the number of times defendant struck her. In the first statement, Vanessa did not say anything about being forced to call Phil.

Officer Berlin took several photographs of Vanessa during the early morning hours on October 29, 2003. The photos depict a few scratches on her upper chest, bruising and swelling on her right hand, and bruising on both cheeks and both arms. Vanessa testified that her bruises became more pronounced a few days later. Officer Berlin did not observe any strangulation marks, bruising, or redness on Vanessa's neck. Vanessa did not complain of any injury to her windpipe. He recalled that she had a horseshoe-shaped injury on her left arm.

Officers David Swing and Jerry Neumayer searched defendant's residence after Vanessa reported the abuse to the police, looking for a knife, a hammer, and Vanessa's sweatshirt. Officer Newmeyer found a

claw hammer in a storage area in the garage; Officer Swing found the sweatshirt in Lupe's room; they did not find the knife. The sweatshirt and hammer were in evidence. The sweatshirt was dirty, covered with dry grass, and had two large tears in the fabric.

Officer Neumayer interviewed Lupe's girlfriend, Stephanie Toste, on the night of the incident. Toste said defendant was "acting crazy" and holding Vanessa's arm when they entered Lupe's room. She told the officer: (1) that Vanessa had injuries to her face and dirt on her clothing; (2) that defendant took the hammer out of Lupe's desk, pointed it at Vanessa and told her to make a phone call; and (3) that Vanessa called Phil and told him she could not see him anymore.

Officer Neumayer also interviewed Lupe. Lupe said he did not tell the officers about the fight between defendant and Vanessa because he did not want to get in the middle of it. Lupe said he saw defendant take a hammer out of a drawer.

### 4. Vanessa's Testimony at Preliminary Hearing

At the preliminary hearing on June 1, 2004,[1] Vanessa denied her statements to the police that defendant had grabbed, choked, kicked, stomped, hit, threatened, or forced her into the car or Lupe's room. She testified that she tackled Antoinette Lopez, a woman who was interested in defendant, and fought with Lopez at defendant's house. Vanessa said she hit defendant several times, but he did not hit her.

At trial, Vanessa testified that she lied at the preliminary hearing, when she said defendant did not injure her and when she testified that Lopez had inflicted the injuries. She said she testified falsely at the preliminary hearing to help defendant "beat the charges" because they were inaccurate. She did not want to get in trouble or lose her son.

Several hours after the preliminary hearing, Vanessa told Claudia that she was not right in the head, had lied to the police, and had set defendant up. Claudia sought medical help for Vanessa because she had cut and scratched her body.

### 5. Vanessa's Trial Testimony

At trial, Vanessa told the jury she did not want to testify because she did not feel the police report or the charges were accurate. She said the whole thing was a big misunderstanding and that she made the police report out of anger, hatred, jealousy, and ignorance. She felt tremendous guilt because defendant was in jail for this case and could not be with his mother when she passed away.

Vanessa testified that defendant kicked in her door on March 19, 2003, after she asked him to sign away his parental rights to their son. She reported the incident to the police. Although he kicked the door, it

---

[1]The transcript of the preliminary hearing, although in the record on appeal, was not in evidence at trial.

did not cause any new damage because the door was already broken.

Vanessa testified that she lied to the police and filed a false report on October 16, 2003, when she told them defendant had scratched her. She said she set defendant up because she was angry that he was going out and was under the influence while she was at home with their baby. She was also upset that Lopez had bailed defendant out of jail a few days earlier.

When defendant came to her house on October 28, 2003, he was sweaty and "real anxious." He did not want to talk to her and asked to speak with her father. Her father calmed defendant down and offered him a ride home. While Felipe was inside getting his car keys, Vanessa and defendant arranged to meet later at a local school.

Defendant was riding in a car with his cousin Anthony Robles and friend Mike Montes as Vanessa walked home from her aunt's house. Defendant poked his head out the car window and they started arguing. Defendant was nervous because they both risked violating the restraining order and she was always calling the police. He wanted her to get in the car with him because she was making a scene. Defendant did not force her into the car. They continued arguing in the car, but defendant did not hit her or pull her hair. Later, she testified that she scratched him by accident or slapped him and then he pulled her hair.

When they got to defendant's house, she tried to jump out of the car to "piss him off" and "make a stupid scene." He did not pull her out of the car as she had reported to the police. They both said things to make each other jealous. He pushed her to the ground; they were wrestling, rolling in the dirt, and at each other's throats. Lupe and Toste broke them up. Lupe told her to shut up and go inside. He was afraid the police would come because of her screaming.

There was a little pushing and shoving as they walked into Lupe's room. Inside, defendant spit at her and shoved her into a wall. They both "disrespect [ed]" each other. They discussed their relationships with Lopez and Phil. Defendant said he did not want to be with Lopez and Vanessa told him there was nothing going on between her and Phil. She said defendant pushed or kicked her while she was on the floor.

There was a hammer in the room. Vanessa reached for it and defendant took it from her. She thought he was going to hit her, but he did not hit her or threaten her with the hammer. After he grabbed the hammer, she tried to get it back and they played tug-of-war with it. She called Phil and broke it off with him to avoid any more drama with defendant.

Lupe told them the police were there. Vanessa went into the garage with defendant voluntarily to hide, because they did not want any more police reports.

Vanessa testified that things were fine between her and defendant after she "broke it off" with Phil. Later, she said she was angry when she left because they had not resolved their issues. When her father picked her up, he was mad at her because she was at defendant's house and it

was late. Her clothes were dirty and her make-up was smeared, so her father asked her what was going on. Her father told her to stay away from defendant because it was not a healthy relationship. Her father told her he had already talked to a lawyer about taking custody of her son, so she decided defendant needed a "time out" and went to the police.

She lied to Officer Berlin when she told him defendant forced her into the car, held her down and struck her in the head, hit her in the face several times, slammed her head to the grounds, strangled her, kicked her, hit her in the arm with the hammer, and slammed her into the wall in Lupe's room. Her hand was swollen because she had hit defendant. She testified at trial that defendant grabbed the hammer away from her and threw it somewhere. She does not know how she got the mark on her arm.

### 6.    Lupe's and Toste's Testimony

Lupe testified that he saw Vanessa with a hammer; he took it from her and put in the garage. Vanessa was angry; defendant was not angry, he was laughing at Vanessa. Lupe repudiated his prior statements to the police and said he did not see any injuries on Vanessa.

Toste did not see anything out of the ordinary when Vanessa and defendant entered Lupe's room. She repudiated her prior statements to the police. She did not see defendant threaten or strike Vanessa.

### B.    October 2004 Incident (Vanessa's Trial Testimony)

Vanessa sold her car to bail defendant out of jail after the preliminary hearing. She continued to see him and they started living together. Later, he missed a court date because she had not written it down correctly. She was afraid he would go back to jail and arranged for him to stay in a recreational vehicle (R.V.) at his uncle's house in Los Banos.

Vanessa took a bus to Los Banos on Friday, October 8, 2004, to stay with defendant over the weekend. She admitted telling a police officer that defendant had greeted her at the bus station by saying "[Y]ou're lucky your cousin is here or I would have beaten the shit out of you for not arriving sooner." However, at trial, she claimed her statement to the officer was not true.

Vanessa testified that she and defendant used a lot of methamphetamine that weekend; they started arguing and it got physical. They spit at each other and were hitting each other. Defendant slapped her pretty hard in the face, pulled her hair and punched her. She ran from him inside the R.V. He pulled her back by the hair, pushed her, and she hit a cabinet. She got a couple of black eyes and a "busted ... nose." She had bruises on her arms. Vanessa did not recall when the injuries occurred over the weekend, but stated that defendant became irritable, tired, sleepy, and delusional while coming down from the methamphetamine on Saturday.

Defendant hit Vanessa while they were walking to the store with one of defendant's friends. She had flirted with defendant's friend to

make defendant jealous and defendant pushed her. At trial, she denied telling the grand jury that defendant had punched her in the face and mouth after she flirted with his friend. After this incident, Vanessa became separated from defendant for several hours. She eventually returned to the R.V.

Vanessa testified that she lied when she told the grand jury (1) that defendant had threatened her after she returned to the R.V.; (2) that defendant had covered her nose and mouth until she could not breathe and passed out; (3) that defendant had sexually assaulted her; and (4) that she had used a knife to cut defendant. She lied to Officer Palsgrove when she told him she smoked rather than injected the methamphetamine and when she said she only used $5 worth of the drug. She lied to Palsgrove when she told him defendant stomped on her or kicked her three or four times outside the R.V. and slammed her head into a window frame.

Defendant became concerned about the injuries Vanessa sustained in Los Banos. She looked "pretty gross" and he did not want her going home looking like that. She had planned to go home on Monday. Defendant asked her to call her parents and make up an excuse to stay longer. Vanessa wanted to leave and go home; she called her parents and asked for the addresses of relatives in Los Banos, so she could borrow some money to take the bus home. Her father suggested she borrow money from defendant's uncle or ask his uncle for a ride home.

Vanessa's father picked her up on Monday. She tried to cover her injuries with make-up and a hat. After her father became aware of her injuries, he took her to the Los Banos police station.

Vanessa reported the events of the weekend to Officer Palsgrove of the Morgan Hill police on October 14, 2004. He took photographs depicting her injuries, which were in evidence. The photos show: (1) two very noticeable black eyes; (2) a 4- to 5-centimeter bruise on the outside of her right upper arm, near the shoulder; (3) a large bruise on the underside of her right upper arm; (4) a 5-centimeter bruise on her left forearm; and (5) puffiness and bruising on her right hand. Vanessa testified that she enhanced her injuries for the photos by applying eye shadow and eyebrow pencil. Later, she testified the only injury she enhanced was the shoulder injury. At trial, she suggested that her father may have bruised her left forearm the day before she went to Los Banos.

On cross-examination, she testified that her statements to the police and the prosecution's investigator and her testimony at the preliminary hearing were a mix of truth and lies. She said she bruises easily and told the jury she and defendant liked to have rough sex, which may account for the bruising.

## C.  Expert Testimony Regarding Battered Women's Syndrome

Richard Ferry, a licensed marriage and family therapist, testified regarding battered women's syndrome (BWS) and domestic violence. He explained that BWS is "a collection of symptoms that occur in many battered women in response to being battered in an intimate relationship." He stated the experience of being battered impacts

women's thinking in several ways. They see the world and themselves as flawed, dangerous and unreliable. They believe their abuser is capable of additional violence that may be more severe. They believe they are negative and blame-worthy, responsible for the violence, and somehow deserving of it. They make excuses for the abuse and find ways to rationalize it. They believe they can manage or control the violence and rely on the defense mechanisms of minimization and denial. Minimization may include describing some kind of mutuality in the event.

Battered women engage in behaviors that may not make sense to others. They may not leave the relationship when they have an opportunity to do so. They may not report the violence to friends or police, may distort the report, minimize the report, refuse to cooperate with the prosecution, or recant. Battered women will employ a variety of strategies to keep themselves safe, some of which may result in increased violence. The victim wants to stop the violence and reduce the danger to herself. If cooperating with the police is going to increase the violence, she is not likely to do that.

Ferry identified several myths associated with domestic violence. It is a myth that a battered woman can always leave the relationship. Ferry explained, if there are children, the woman may believe a violent father is better than no father or fear a potential threat to the child if she leaves. There might be economic pressures preventing a woman from leaving or the woman might believe the man will follow her and force her to return if she tries to leave. Some women believe the system is powerless to help them. Domestic violence does not mainly affect poor people. "[A]ffluent people are better able to conceal violence" while "poor people are more likely to use the police and public health clinics ... to help them with these situations. And those are locations where statistics are gathered." According to Ferry, alcoholism and drug addiction do not cause domestic violence; however, they loosen inhibitions, facilitate the collapse of self-control, and provide the batterer with a convenient excuse.

Ferry indicated there are seven broad categories of abusive behavior that constitute domestic violence, including imposing isolation from friends and family on the victim; financial exploitation; using the children against the victim; verbal and emotional abuse; threats, harassment and stalking; and physical violence. He described various forms of physical violence.

Ferry described the "cycle of violence" theory developed by Lenora Walker, a psychologist who has done extensive research on BWS. She proposed three phases of the cycle: (1) tension building; (2) acute violence; and (3) loving contrition or remorse. Some women will provoke the violence in an attempt to terminate unbearable tension and get the situation over with. The final phase explains why battered women stay with abusive men. Ferry indicated some believe the cycle of violence does not involve loving contrition; rather, it involves only one episode after another. Ferry stated that, without treatment, the violence becomes more severe and more frequent.

Ferry discussed the concept of "traumatic bonding." In BWS, it

includes a pronounced loyalty to the abuser. The victim may take on the abuser's beliefs, see herself as troublesome, unattractive, stupid, and fail to take action on her own behalf, including failing to cooperate with the police. Recanting is common in such cases, either as a manifestation of traumatic bonding or a survival strategy. Some battered women change their stories to protect their abusers.

Ferry acknowledged that he did not know defendant or Ruiz, although he may have met Ruiz briefly the day he testified when he asked a woman for change for a dollar. Ferry did not know the specific facts of this case and could not say whether Ruiz suffers from BWS.

On cross-examination, he agreed that BWS is not the sole basis for determining whether an allegation is true. His role is not to make a clinical analysis of Ruiz or determine the truth of the charges. He acknowledged that a woman who has BWS can lie and that there are women who make false domestic violence claims. He assumes the woman has lied somewhere along the way or he would not have been asked to testify.

## II.     Defense Case

Defendant did not testify. His uncle, Fidel Ortiz, testified that defendant stayed in an R.V. on his property for two weeks in October 2004. He recalled that Vanessa visited over a weekend. They had a barbeque together and everything seemed fine. Vanessa used the bathroom in his house. He did not notice anything unusual the entire weekend and never noticed any bruises on her.

See People v. Varelas, 2007 WL 1168858, 1-8 (Cal.App.) (Resp't Ex. 4) (footnote in original).

## DISCUSSION

### A.     Standard of Review

Because the instant petition was filed after April 24, 1996, it is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), which imposes significant restrictions on the scope of federal habeas corpus proceedings.  Under AEDPA, a federal court cannot grant habeas relief with respect to a state court proceeding unless the state court's ruling was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  "Under the 'contrary to' clause, a federal

habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000).  "Under the 'unreasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id.   "[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.

A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable."  Id. at 409.  The "objectively unreasonable" standard does not equate to "clear error"  because "[t]hese two standards . . . are not the same.  The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."  Lockyer v. Andrade, 538 U.S. 63, 75 (2003).

A federal habeas court may grant the writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d)(2).  The court must presume correct any determination of a factual issue made by a state court unless petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

**B.    Analysis of Legal Claims**

Petitioner has raised three cognizable claims for federal habeas relief:  (1) the trial court erred in refusing to dismiss a juror; (2) the trial court erred in permitting the prosecution to introduce expert evidence regarding Battered Women's Syndrome; and

1   (3) the trial court erred in refusing to admit evidence regarding the victim's psychiatric

2   problems to attack her credibility.

3   **1.     Juror No. 10**

4           Petitioner claims that his right to due process was violated when the trial court

5   denied his request to dismiss Juror No. 10.  Petitioner contends that Juror No. 10

6   should have been dismissed for bias because she inadvertently failed to disclose her

7   experience with domestic violence during voir dire, instead disclosing such information

8   on the third day of the trial.

9           The following facts regarding Juror No. 10 are taken from the opinion of the

10  California Court of Appeal:

11              During jury voir dire, the court asked the prospective jurors
    whether they knew anyone who had been arrested for, charged with or
12  accused of a domestic violence offense or who had been a complaining
    witness or a victim of domestic violence. Three prospective jurors
13  disclosed their personal experiences involving domestic violence to the
    court and counsel in private, outside the presence of other prospective
14  jurors. Four other prospective jurors disclosed their experiences with
    domestic violence in front of the other prospective jurors. These
15  prospective jurors related experiences of domestic violence involving
    their parents, adult children, and friends. Juror No. 10 did not mention
16  any experience with domestic violence at any time during voir dire. Jury
    selection was completed in a single day on Monday, May 23, 2005.

17              On Wednesday morning, on the third day of trial and after a half
18  day of opening statements and testimony on Tuesday, Juror No. 10
    handed the court a note, which stated: "I wanted to let you know that due
19  to extreme nervousness I did not let you know on Monday that I am very
    close with someone who was involved in an extremely abusive spousal
20  situation. I honestly did not think about it Monday and on Tuesday did
    not know if it was too late to mention this. [¶] My Mother[-in-]law's
21  husband, (My husband's Father) was extremely physically and verbally
    abusive to my Mother[-in-]law, Husband, Sister[-] and Brother[-in-]law.
22  I never met my husband's Father but have heard many horrifying, sad
    stories. [¶] This statement is not an attempt to get out of jury duty and [I]
23  feel to the best of my ability I think I can serve fairly on this jury. I just
    needed to let you know this about me. [¶] Thank you-Sincerely, Juror
24  10."

25              At midday, outside the presence of the jury, the court read Juror
    No. 10's note to counsel and asked them to think about their proposed
26  responses over the noon recess. The presentation of evidence continued
    through the afternoon. At about 4:30 p.m., the court excused the jurors
27  except for Juror No. 10 and conducted a hearing regarding Juror No. 10's
    note. The court asked Juror No. 10 whether she believed she could still
28  serve fairly on the jury. The following discussion ensued:

"JUROR NUMBER 10: Umm, yes, I think so. I guess Monday when-during the questioning, I was so nervous that I just-you know. Then when I drove home, I thought: My God, I didn't even mention that. Then yesterday, I was going to approach you. Then I thought gosh, is it too late? So I just wanted to be extremely honest about it.

"THE COURT: It's exactly what we expect. I appreciate your candor and honesty. You're [ sic ] heard some of the evidence. [¶] Has your opinion changed that you can continue to be fair and serve and be fair and impartial in this case?

"JUROR NUMBER 10: Umm, I think I can. But I'm struggling because it's my husband's mother, my mother-in-law. And you know, I have heard considerable amount of horrible stories about-from his father's spousal abuse.

"THE COURT: Okay. But let's see. The opinion you expressed this morning is that you think you can still serve fairly. Is that still your opinion?

"JUROR NUMBER 10: Yes.

"THE COURT: Let me see if the attorneys have any questions they'd like to ask.

"[PROSECUTOR]: ... Juror Number 10, as I understand it, it was an oversight on your part in not informing us of this fact during jury selection.

"JUROR NUMBER 10: That is correct. I think because I was extremely nervous, and I honestly did not even think of it. Then while driving home, I'm like: Wow, I know someone extremely close to me.

"[PROSECUTOR]: So we're clear, the acts that you've described of the judge, you never actually saw those acts. You've heard about them secondhand?

"JUROR NUMBER 10: That's correct. It was my husband's dad.

"[PROSECUTOR]: And the person that you heard them from was your husband or your mother-in-law?

"JUROR NUMBER 10: I've heard them from my mother-in-law, my husband, and my sister-in-law. [¶] ... [¶]

"[DEFENSE COUNSEL]: You seem to be having some pause when you are asked whether you can be fair and impartial. Would it be more of a struggle in this kind of case than, say, you know, a bar fight or something like that?

"JUROR NUMBER 10: Yes.

"[DEFENSE COUNSEL]: Okay. And you think it would be a difference in how you would be able to view the evidence in those two different types of situations?

Order Denying Petition for Writ of Habeas Corpus
P:\PRO-SE\SJ.JF\HC.08\Varelas505_denyHC.wpd

1    "JUROR NUMBER 10: Yes, definitely.

2        [DEFENSE COUNSEL]: Okay. So, I mean, it would take a
    definite effort that you wouldn't have to put out if it was a different kind
3    of case?

4        "JUROR NUMBER 10: That's correct. [¶] ... [¶] That's why I
    wanted to make sure and bring that to the judge's attention. [¶] ... [¶] I've
5    been worried about that."

6        After Juror No. 10 left the courtroom, defense counsel argued
    there was a real danger of prejudice. He stated Juror No. 10 "was pausing
7    when both the Court and counsel asked whether she could be fair and
    impartial." He argued that if she had given those types of answers during
8    jury selection, "it would have been close to cause" and that he would
    have used a peremptory challenge. Because of the late disclosure and the
9    fact that there were two alternates, he asked that Juror No. 10 be excused.
    The prosecutor argued that cause had not been established.
10        The court gave counsel the opportunity to research the matter
    overnight. The court stated, "I agree there were pauses, but I also found
11    her credible when she told me that upon reflection, she thought she could
    still be fair and impartial and do her job." The court and the parties
12    revisited the issue two days later. The judge advised the parties that there
    were two grounds that might constitute good cause to dismiss a juror:
13    actual bias and juror misconduct. Defense counsel said he did not believe
    there was juror misconduct, but argued there was bias. He also asked for
14    an opportunity to question Juror No. 10 further. The prosecutor argued
    that they had already conducted an adequate inquiry into the matter.

15        The court denied the request to question Juror No. 10 further and
    concluded there was no evidence that Juror No. 10 harbored actual bias.
16    The court observed that the juror was not a victim of domestic violence
    or a percipient witness to domestic violence. She had been informed of
17    domestic violence in her husband's family. She had told the court, both in
    her letter and at the hearing that she thought she could be fair. The court
18    stated "But in watching her carefully, I was persuaded by her tone, body
    language, and the words that she told us that she was sincere in her belief
19    that she could be fair and impartial." The court held that the juror's
    failure to disclose the information was inadvertent and that there was no
20    misconduct and denied defendant's request to dismiss Juror No. 10.

21    Varelas, 2007 WL 1168858 at 8-10.

22        The Ninth Circuit has identified three theories of juror bias based on a

23    misstatement by a juror during voir dire: (1) where a juror fails to answer honestly and,

24    had the juror answered correctly, the information would have provided a basis for a

25    challenge for cause, see McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548

26    (1984), (2) "actual bias, which stems from a pre-set disposition not to decide an issue

27    impartially," and (3) "implied (or presumptive) bias, which may exist in exceptional

28

Order Denying Petition for Writ of Habeas Corpus
P:\PRO-SE\SJ.JF\HC.08\Varelas505_denyHC.wpd

circumstances where, for example a prospective juror has a relationship to the crime itself or to someone involved in a trial, or has repeatedly lied about a material fact to get on the jury." Fields v. Brown, 503 F.3d 755, 766 (9th Cir. 2007) (en banc).

Juror No. 10's failure to disclose information regarding her experience with domestic violence does not constitute the first type of bias described in McDonough. In order to obtain a new trial because a juror failed to answer a voir dire question correctly, a petitioner must show both that the juror failed to answer honestly a voir dire question, and that this undermined the impartiality of the petitioner's jury. Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir. 1998) (en banc). The motives for concealing information may vary, but only those reasons that affect a juror's impartiality truly can be said to affect the fairness of the trial. McDonough, 464 U.S. at 556. Forgetfulness, for example, does not indicate a lack of impartiality. See United States v. Edmond, 43 F.3d 472, 473-74 (9th Cir. 1994) (no misconduct where district court found juror's testimony that he forgot about being victim of armed robbery truthful). Here, neither party disputes the trial court's finding that Juror No. 10 was honest and that her failure to answer the voir dire question correctly was the result of forgetfulness. Moreover, Juror No. 10's statements to the trial court and her voluntary disclosure of the information on the third day of the trial suggest that she had no motive to conceal the information. Because Juror No. 10's failure to answer the voir dire question correctly was honest, she did not exhibit the kind of bias described in McDonough.

Juror No. 10's failure to disclose pertinent information also fails to constitute "actual bias," the second type of bias identified in Fields. The California Court of Appeal rejected Petitioner's claim that Juror No. 10 should have been dismissed on the basis of actual bias based on the following analysis:

> [T]he trial court did not abuse its discretion in finding Juror No. 10's nondisclosure to be inadvertent and in finding no bias on her part. In the context of voir dire examination, it is conceivable that a juror might not recall that her mother-in-law, husband and sister-in-law had been the victims of physical and verbal abuse by her father-in-law. As the trial court observed, Juror No. 10 did not experience the domestic violence personally and did not witness any of the alleged conduct. She never met

Order Denying Petition for Writ of Habeas Corpus
P:\PRO-SE\SJ.JF\HC.08\Varelas505_denyHC.wpd

her father-in-law and heard stories about his abuse from her husband and his family members. Notwithstanding her husband's and her in-law's experiences, Juror No. 10 affirmed her belief that she could be fair and impartial, both in her letter to the court and at the hearing. Her candid disclosure of the information shortly after she recalled it supports her determination to be a fair and impartial juror.

Varelas, 2007 WL 1168858, at 12.

A state court's determination that a juror was not actually biased is entitled to a presumption of correctness on federal habeas review, and relief may be granted only if there is no fair support in the record for the trial court's determination that the juror was unbiased. Wainwright v. Witt, 469 U.S. 412, 424, 429 (1985). Here, as explained by the state appellate court, there is fair support for the trial court's finding that Juror No. 10's failure to disclose pertinent information during voir dire did not constitute actual bias. Actual bias is bias in fact--the existence of a state of mind that leads to an inference that the person will not act with entire impartiality. See United States v. Gonzalez, 214 F.3d 1109, 1112 (9th Cir. 2000). Petitioner argues that Juror No. 10's statements that she was "struggling because it's my husband's mother" and "worried about" treating the case differently than a hypothetical case concerning a bar fight are evidence of actual bias. (Petition at 8); Varelas, 2007 WL 1168858, at 13. However, Juror No. 10 affirmed, both in her written note and when questioned by the trial judge and defense counsel, that she felt that she could remain fair and impartial. In addition, the trial judge made observations that "in watching [Juror No. 10] carefully, I was persuaded by her tone, body language, and the words that she told us that she was sincere in her belief that she could be fair and impartial." Varelas, 2007 WL 1168858 at 10. These factors constitute fair support in the record for the trial court's decision not to dismiss Juror No. 10 on the basis of actual bias.

Finally, the record also does not indicate that Juror No. 10 suffered from implied bias. The state appellate court correctly rejected Petitioner's claim that Juror No. 10's failure to disclose pertinent information during voir dire constituted implied bias, concluding as follows:

Order Denying Petition for Writ of Habeas Corpus
P:\PRO-SE\SJ.JF\HC.08\Varelas505_denyHC.wpd

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

"Juror No. 10 was not a victim of her father-in-law's abuse, did not witness the abuse, never met her father-in-law, and only heard stories about the abuse from others.  In our view, these facts are insufficient to create a presumption of bias that could not be overcome by a finding that [the juror] could be fair and impartial."

Varelas, 2007 WL 1168858, at 13.

Courts may presume bias only in "exceptional circumstances."  Fields, 503 F.3d at 766.  Unlike the inquiry for actual bias, in which the court examines the juror's answers on voir dire for evidence that he was in fact partial, the issue for implied bias is whether an average person in the position of the juror in controversy would be prejudiced.  Gonzalez, 214 F.3d at 1112 (citing cases in which implied bias was found).  Prejudice is to be presumed where the relationship between a prospective juror and some aspect of the litigation is such that it is "highly unlikely that the average person could remain impartial in his deliberations under the circumstances."  Id. (internal quotations omitted).  Federal courts have found implied bias in cases where the juror in question has had some personal experience that is similar or identical to the fact pattern at issue or where the juror is aware of highly prejudicial information about the defendant.  See id. at 1112-13 & n.4 (cataloguing cases in which implied bias was found).

It is not extraordinary for a juror to know someone who has been the victim of domestic abuse, nor is it surprising that a juror would find cases involving such abuse particularly difficult.  Petitioner does not argue that the incidents of abuse that she heard her family members talk about were similar or identical to the facts of this case.  Moreover, Juror No. 10 did not personally experience or witness the abuse.  Under these circumstances, the state courts reasonably could conclude that Juror No. 10's exposure to domestic violence did not make it "highly unlikely that the average person could remain impartial," and thus that bias should not be implied.  See id. at 1112 (internal quotations omitted).

Accordingly, the state court's rejection of Petitioner's claim of juror bias was neither contrary to nor an unreasonable application of federal law, and Petitioner is not

Order Denying Petition for Writ of Habeas Corpus
P:\PRO-SE\SJ.JF\HC.08\Varelas505_denyHC.wpd

1    entitled to federal habeas relief on his first claim.

2          2.      **Admission of Evidence Regarding Battered Women's Syndrome**

3          Petitioner claims that the trial court violated his right to due process and a fair

4    trial by admitting expert testimony regarding Battered Women's Syndrome ("BWS").

5    Specifically, Petitioner argues that the expert testimony was irrelevant because there

6    was "no evidence that Vanessa was a battered woman," and that the testimony was

7    prejudicial because it "neatly coincided with the prosecution's theory of the case."

8    (Petition at 9-10.)

9          The Supreme Court "has not yet made a clear ruling that admission of irrelevant

10   or overtly prejudicial evidence constitutes a due process violation sufficient to warrant

11   issuance of the writ." Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009).

12   The Supreme Court has also left open the question whether the Constitution is violated

13   by the admission of expert testimony concerning an ultimate issue to be resolved by the

14   trier of fact. See Moses v. Payne, 555 F.3d 742, 761 (9th Cir. 2009). Thus, while,

15   under Ninth Circuit precedent, it is "well established . . . that expert testimony

16   concerning an ultimate issue is not per se improper," for purposes of habeas corpus

17   review it suffices to determine that no Supreme Court case has squarely addressed the

18   issue and, therefore, a state appellate court's decision affirming the admission of such

19   testimony is not contrary to or an unreasonable application of clearly established

20   Supreme Court precedent under 28 U.S.C. § 2254(d)(1). Id. at 761-62. Under

21   AEDPA, federal habeas relief cannot be granted on Petitioner's second claim because

22   the state court's ruling regarding the admission of evidence on BWS was not contrary

23   to or an unreasonable application of "clearly established federal law, as determined by

24   the Supreme Court of the United States." See 28 U.S.C. § 2254(d)(1).

25         Even if federal habeas relief were available based upon a claim that the

26   admission of irrelevant or overtly prejudicial evidence constitutes a due process

27   violation, such relief would not be warranted in this case. The admission of evidence

28   is not subject to federal habeas review unless a specific constitutional guarantee is

Order Denying Petition for Writ of Habeas Corpus
P:\PRO-SE\SJ.JF\HC.08\Varelas505_denyHC.wpd

1  violated or the error is of such magnitude that the result is a denial of the

2  fundamentally fair trial guaranteed by due process.  Henry v. Kernan, 197 F.3d 1021,

3  1031 (9th Cir. 1999).  Only if there are no permissible inferences that the jury may

4  draw from the evidence can its admission violate due process.  Jammal v. Van de

5  Kamp 926 F.2d 918, 920 (9th Cir. 1991).  Failure to comply with state rules of

6  evidence is neither a necessary nor a sufficient basis for granting federal habeas relief

7  on due process grounds.  Henry, 197 F.3d at 1031; Jammal, 926 F.2d at 919.

8      The California Court of Appeal rejected Petitioner's claim that the expert

9  testimony regarding BWS was irrelevant, stating that "the prosecution need not prove

10  prior incidents of intimate partner battery for this evidence to be admissible when the

11  victim's credibility is at issue."[2]  Varelas, 2007 WL 1168858, at 16.  The Court of

12  Appeal explained the relevance of the expert testimony as follows:

13          One of the primary issues in this case was Vanessa's credibility.
        Vanessa changed her story repeatedly.  She gave different information in
14          her initial report to the police, her testimony at the preliminary hearing,
        her testimony before the grand jury, and at trial.  Thus, the evidence was
15          relevant because it would assist the jury in evaluating the credibility of
        Vanessa's "trial testimony and earlier statements to the police, by
16          providing relevant information about the tendency of victims of domestic
        violence later to recant or minimize their description of that violence."

17  Id. (quoting People v. Brown, (2004) 33 Cal.4th 892, 895-896).

18      Petitioner argues that the expert testimony was irrelevant under California

19  Evidence Code Section 1107 because there was insufficient evidence of prior incidents

20  of abuse.  However, even if Petitioner were correct, he does not address the Court of

21  Appeal's finding that the expert testimony was relevant for the alternative purpose of

22  evaluating the victim witness's credibility.  Only if there are no permissible inferences

23  _____

24      [2]The state appellate court did not reach the question of whether the expert testimony was
admissible under California's statute authorizing the use of expert evidence regarding BWS,
25  California Evidence Code section 1107.  However, the Court did find that "the factual
premise for defendant's argument is incorrect," and that "there was evidence that [victim] had
26  been battered before both the October 28, 2003 incident and the October 2004 incident."
Varelas, 2007 WL 1168858, at 15.

27

28

Order Denying Petition for Writ of Habeas Corpus
P:\PRO-SE\SJ.JF\HC.08\Varelas505_denyHC.wpd

the jury may draw from the evidence can its admission violate due process.  Jammal, 926 F.2d at 920.  The victim's credibility was an important issue at trial.  The victim testified that she lied at the preliminary hearing when she said defendant did not injure her, and that she lied to the police on multiple occasions and filed a false police report on October 16, 2003.  Varelas, 2007 WL 1168858, at 4-6.  She also denied under oath that she had told a grand jury that defendant had punched her in the face and mouth after she flirted with his friend.  Id. at 6.  Additionally, Officer Berlin testified that there were minor inconsistencies between the victim's original statement to police and her videotaped statement to police.  Id. at 3.  The expert testimony that BWS causes the victim to change her account of the abuse was relevant to the credibility of the victim's account of her abuse because she had changed her story many times.

Petitioner also argues that the expert testimony, even if relevant, violated his constitutional rights because it "neatly coincided with the prosecutor's theory of the case."  (Petition at 10.)  Although Petitioner concedes, and the record shows, that the expert witness testified only regarding the general theory of BWS, including about the "myths" associated with BWS and the "cycle of violence," Petitioner nonetheless contends that "any reasonable juror, regardless of a limiting instruction, would think that, because the expert's testimony regarding BWS matched some facts of the case at hand, the defendant must surely be a batterer, and is therefore guilty."  (Id. at 10.)  Petitioner's argues that trial judge's limiting instruction and the prosecutor's closing argument failed to properly instruct the jury on permissible uses of the expert testimony, but he does offer any facts or evidence to suggest that the jury actually misunderstood the purpose of the expert testimony, nor does he contend that the instructions or the prosecutor's closing statement misstated the law.  (Id. at 10-11.)

Moreover, the conflict between Petitioner's two arguments opposing the admission of the BWS evidence illustrates the implausibility of Petitioner's theory.  Petitioner argues both that the expert testimony is irrelevant because there was "no evidence that Vanessa was a battered woman," and that the expert testimony on BWS

was so relevant to the facts of his case as to be overtly prejudicial.  (<u>Id</u>. at 9, 10.)  As Respondent points out, under Petitioner's theory expert testimony would almost never be admissible, as testimony that fit the facts well always would be unduly prejudicial, while testimony that fit the facts poorly would be irrelevant.  The jury was free to accept or reject the expert's testimony about the existence of BWS and its applicability to the victim in this case.

As the evidence regarding BWS was both relevant and not impermissibly prejudicial, its admission did not render the trial fundamentally unfair in violation of due process.  Accordingly, the state courts' rejection of Petitioner's claim was neither contrary to nor an unreasonable application of federal law, and Petitioner is not entitled to federal habeas relief on his second claim.

3.    **Exclusion of Evidence Regarding Vanessa's Psychiatric History**

Petitioner's third claim alleges that the trial court violated his constitutional rights by excluding evidence that the victim had been involuntarily committed to a hospital for an undiagnosed mental illness after testifying at the preliminary hearing. Petitioner argues that evidence of the victim's involuntary commitment and psychiatric problems is relevant to attack the victim's credibility.

"State and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials."  <u>Holmes v. South Carolina</u>, 547 U.S. 319, 324 (2006) (quotations and citations omitted).  This latitude is limited, however, by a defendant's constitutional rights to due process and to present a defense, rights originating in the Sixth and Fourteenth Amendments.  <u>See id.</u>, 547 U.S. at 324. "While the Constitution prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury."  <u>Holmes</u>, 547 U.S. at 325-26.

Order Denying Petition for Writ of Habeas Corpus
P:\PRO-SE\SJ.JF\HC.08\Varelas505_denyHC.wpd

1

In deciding if the exclusion of evidence violates the due process right to a fair

2

trial or the right to present a defense, the court balances the following five factors: (1)

3

the probative value of the excluded evidence on the central issue; (2) its reliability; (3)

4

whether it is capable of evaluation by the trier of fact; (4) whether it is the sole

5

evidence on the issue or merely cumulative; and (5) whether it constitutes a major part

6

of the attempted defense.  Chia v. Cambra, 360 F.3d 997, 1004 (9th Cir. 2004) (citing

7

Miller v. Stagner, 757 F.2d 988, 994 (9th Cir. 1985)).  The court must also give due

8

weight to the state interests underlying the state evidentiary rules on which the

9

exclusion was based.  See Chia, 360 F.3d at 1006; Miller, 757 F.2d 988, 995 (9th Cir.

10

1985).

11

The California Court of Appeal addressed Petitioner's claim on its merits as

12

follows:[3]

13

> Defendant's contention also lacks merit. As the court observed in
> Anderson, "It is a fact of modern life that many people experience
> emotional problems, undergo therapy, and take medications for their
> conditions. 'A person's credibility is not in question merely because he or
> she [has received] treatment for a mental health problem.'" (Anderson,
> supra, 25 Cal.4th at p. 579). Evidence that Vanessa had been diagnosed
> with a specific psychiatric condition would have added little to the
> evidence presented regarding her credibility. Defense counsel was
> allowed to cross-examine Vanessa fully. She testified she had lied on
> numerous prior occasions, both to the police and in court proceedings.
> She discussed her motives for lying and her relationship with defendant.
> The jury heard about her emotional state after the preliminary hearing,
> that she had injured herself that evening and received medical treatment,
> that she had injured herself previously, and that she claimed some of the
> injuries depicted in the photographs were self-inflicted. Nothing more
> was necessary.

21

Id.

22

Petitioner has not shown that the trial court's exclusion of evidence regarding

23

the victim's involuntary commitment and psychiatric problems deprived him of a "fair

24

opportunity to defend against the State's accusations."  Chia, 360 F.3d at 1003 (internal

25

quotation omitted).  Petitioner argues that "[c]ertain forms of mental disorder have

26

27

[3]Because Petitioner's third claim fails on its merits, the Court need not address
Respondent's alternative argument that the claim is procedurally defaulted.

28

[h]igh probative value on the issue of credibility," and that "many types of emotional or mental defect[s] may materially affect the accuracy of testimony." (Petition at 11-12.) However, trial judges are permitted to exclude evidence if "its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." Holmes, 547 U.S. at 326. Here, there is ample support for the state appellate court's conclusion that the excluded evidence would have "added little to the evidence presented regarding the victim's credibility." Varelas, 2007 WL 1168858 at 17. Petitioner was allowed to cross-examine the victim fully. Id. As the Court of Appeal noted, the victim testified at trial that she had lied to police and in court on multiple occasions. Id. The jury heard testimony regarding the victim's emotional state immediately after the preliminary hearing, and that the victim had injured herself. Id. Additionally, Officer Berlin testified that there were inconsistencies between the victim's first and second statements to police. Id. at 3. As the evidence was largely cumulative of the other evidence used to impeach the victim, and there was ample other evidence with which to cross-examine her more effectively, its exclusion did not violate his constitutional rights to a fair trial and to present a defense.

Accordingly, the state court's rejection of Petitioner's claim was neither contrary to nor an unreasonable application of federal law, and Petitioner is not entitled to federal habeas relief on his third claim.

**CONCLUSION**

The Court concludes that Petitioner has not shown any violation of his federal constitutional rights in the underlying state criminal proceedings. Accordingly, the petition for a writ of habeas corpus is DENIED.

No certificate of appealability is warranted in this case. See Rule 11(a) of the Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (requiring district court to rule on certificate of appealability in same order that denies petition). Petitioner has failed to make a substantial showing that any of his claims amounted to a denial of his

1   constitutional rights or demonstrate that a reasonable jurist would find this Court's

2   denial of his claims debatable or wrong.  See Slack v. McDaniel, 529 U.S. 473, 484

3   (2000).

4       The Clerk shall enter judgment and close the file.

5       IT IS SO ORDERED.

6   DATED:  4/27/10                          _____

7                                            JEREMY FOGEL
                                             United States District Judge

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

JOSE LUIS VARELAS,

          Petitioner,

  v.

DARREL ADAMS, Warden,

          Respondent.

_____/

Case Number: CV08-03505 JF

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on ___4/30/10_____, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Jose Luis Varelas
F-11094
CA State Prison-Corcoran III
P.O. Box 3476
Corcoran, CA 93212

Dated: 4/30/10

                            Richard W. Wieking, Clerk
                            By:

Order Denying Petition for Writ of Habeas Corpus
P:\PRO-SE\SJ.JF\HC.08\Varelas505_denyHC.wpd